```
                 UNITED STATES DISTRICT COURT              FILED
                 NORTHERN DISTRICT OF ALABAMA
                      NORTHEASTERN DIVISION              00 MAR 28 PM 4:14

WILEY DAY and YOLANDA DAY,     )                         U.S. DISTRICT COURT
                               )                          N.D. OF ALABAMA
       Plaintiffs,             )
                               )
vs.                            ) Civil Action No. CV-98-S-3172-NE
                               )
OMNI INSURANCE COMPANY and     )
OMNI INDEMNITY COMPANY,        )                          ENTERED
                               )
       Defendants.             )                         MAR 28 2000
```



## MEMORANDUM OPINION

This action is before the court on defendants' motion for summary judgment. For the reasons set forth below, the court finds that defendants' motion is due to be granted in part and denied in part.

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).

Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiffs.

3

## II. FACTUAL BACKGROUND

Plaintiffs Wiley and Yolanda Day, husband and wife, were involved in a single-car automobile accident on August 17, 1997.[1] The accident occurred while plaintiffs were returning home to Huntsville, Alabama, after visiting with their daughter in Tuscaloosa.[2] They left Tuscaloosa around 2:00 a.m., heading North to Huntsville on Alabama Highway 69.[3] Mr. Day was driving plaintiffs' 1993 Toyota Camry, and Ms. Day was napping in the passenger seat.[4] Approximately five miles from the intersection of Highway 69 with Interstate 65, Mr. Day struck something, possibly a dog, that entered the road in the direct path of plaintiffs' car.

> As I was traveling down 69 — which is a road that I'm familiar with traveling because I did a lot of insurance in that area over the years ... everything was going pretty much well. Didn't see any — not a lot of traffic traveling at the time. I may have passed one car or two in the whole trip, three at the most. And at some point in time I was driving and I saw something just kind of dart out from the left side of me into the path of the car and I tried to put on the brakes just a little bit. And the next thing I know I head a loud noise, you know, more so like I struck something versus running over it with the wheels.
>
> At about that time, I think my wife was either sleeping or nodding or dozing. I don't know if I said, "Dog gone," you know, "I hit something." So, I asked her ... if she would let her window down on the side. I turned the radio down.

---

[1] Wiley Day's deposition at 7.

[2] *Id.* at 25.

[3] *Id.* at 28.

[4] *Id.* at 32, 59.

4

> I let my window down because I wanted to hear for a noise or see if something had damaged the tire. I was hoping I was not going to have a flat tire or anything and just listened for things in general. So, we proceeded on down that road. Seemed like the car was going fine, and then I'm approaching Interstate 65.[5]

Plaintiffs did not hear any abnormal noises, and Mr. Day did not want to stop the vehicle, because he was concerned about their safety "considering the fact that I'm on a rural road, very curvy, dark ... and I didn't want someone to come up from behind and hit us."[6] Therefore, Mr. Day continued to drive, and when he reached the intersection with Interstate 65, he headed north towards Huntsville.[7]

Mr. Day drove approximately five miles on Interstate 65 before he began to hear a noise coming from the car.[8] He immediately stopped his car on the exit ramp at Exit 304 in Cullman, Alabama.[9] He looked under the hood of his car while the engine was running, and "determined that the noise was coming from my fan blade going around [and] seemed like it was hitting that guard, the guard that goes around the fan."[10] Mr. Day attempted to bend the fan guard

---

[5] *Id.* at 31-32.
[6] *Id.* at 114.
[7] *Id.* at 35.
[8] *Id.* at 36.
[9] *Id.*
[10] *Id.*

5

back into place, and then got back into his car and re-entered the interstate.[11] Five minutes later, however, Mr. Day again heard a noise coming from the engine.[12] Mr. Day left the interstate at exit 310 and drove to an Amoco convenience station.[13]

> I went over to the Amoco station, pulled up ... to the gas pump, again raised the hood, got out [with] the engine running to my knowledge; and again, sa[w] that the fan had moved out, and I knew that adjusting it was not the answer.
>
> So, I went into the trunk of the car, and I had an appliance. I don't know if it was my VCR or fan or something we had back there. I cut the cord off of the VCR or whatever appliance I had in the trunk of the car and took it and tied it around the fan guard. And whatever it was that I attached it to[,] then I wrapped it several times around that guard and tied it tight. And then once I did that, again that striking noise went away completely.[14]

Once Mr. Day secured the fan guard, plaintiffs again returned to the interstate.[15] Just prior to exit 318 at the top of a steep incline, Mr. Day heard a different sound coming from the engine and saw smoke pouring out from under the hood.[16] The engine "shut-down," so the car coasted off the interstate at the exit ramp, and into a Shoney's parking lot.[17] Mr. Day spent the remainder of the

---

[11] *Id.* at 37.
[12] *Id.* at 43-44.
[13] *Id.* at 44.
[14] *Id.* at 44-45.
[15] *Id.* at 45.
[16] *Id.* at 48.
[17] *Id.* at 49.

6

night in his car,[18] and tried to put water in the radiator the next morning after the engine cooled down.[19]  "I stepped back and looked and all of the water ... I was putting into the top of the radiator [seemed like] was running down on the ground, and I knew then that there was a different problem."[20]  Plaintiffs never saw any kind of engine light appear on the instrument panel of their vehicle.[21]  Mr. Day called a towing company, and his vehicle was taken to Bill Penny Oldsmobile (the "dealership") in Huntsville.[22]

The car dealership determined that there was a hole in the bottom of the radiator, and the coolant had escaped through this hole, causing the engine to overheat.[23]  The engine's headgasket blew, thereby damaging the engine.[24]  There was also physical damage to the underside of the vehicle, including the fan guard.[25]

Plaintiffs' vehicle was insured in 1997 under a automobile policy issued by defendants.[26]  After his vehicle was towed to the dealership, Mr. Day called defendants, reported the accident, and

---

[18] One of plaintiffs' children drove from Huntsville and took Ms. Day home. Id. at 49-50.

[19] Id. at 51.

[20] Id. at 52.

[21] Wiley Day's affidavit.

[22] Wiley Day's deposition at 62.

[23] Id. at 64; see also defendants' exhibit 2.

[24] Defendants' exhibit 2.

[25] Wiley Day's deposition at 64.

[26] Complaint ¶ 4; Answer ¶ 2.

7

made arrangements to receive a rental car.[27] The dealership estimated that the damage to the vehicle totaled $1556.91.[28] Defendants mailed plaintiffs a check in the amount of $1346.38, thereby reimbursing them for most of the repairs, but refused to replace the engine, concluding that "it was [damaged] as a result of the vehicle being driven after the impact and would not be considered direct and accidental."[29] Plaintiffs endorsed the check over to the car dealership, but because the check did not completely cover the dealership's expenses, and plaintiffs could not contribute the balance, the dealership retained plaintiffs' vehicle.[30] Plaintiffs' are accumulating $4 per day in storage fees, and were forced to make other arrangements for transportation.[31]

Plaintiffs filed this lawsuit in the Circuit Court of Cullman County, Alabama, claiming that defendants breached their insurance contract, and committed the torts of bad faith and fraud, as they are defined in Alabama law. They seek $4,000 in compensatory damages, as well as an unspecified sum of punitive damages.

---

[27] Wiley Day's deposition at 65.

[28] Defendants' exhibit 3.

[29] *Id.*

[30] Wiley Day's deposition at 87-88.

[31] Plaintiffs originally rented a car from a friend for either $100 or $150 per month. *Id.* at 79. Then, plaintiffs were able to obtain financing (although they had declared bankruptcy in 1992 and 1994), and purchased a 1992 Cadillac for approximately $6,400. *Id.* at 24-25, 80.

8

Defendants removed this action on December 22, 1998, arguing diversity jurisdiction under 28 U.S.C. § 1332, due to plaintiffs' demand for punitive damages.

Thereafter, defendants filed this motion for summary judgment, requesting that the court dismiss all claims asserted by plaintiffs. Although this court recently gave plaintiffs an opportunity to amend their complaint to specifically claim less than the jurisdictional threshold, plaintiffs have failed to do so. Accordingly, the court examines the merits of defendants' motion.

### III.   DISCUSSION

#### A. Breach of Contract

Defendants argue that plaintiffs' breach of contract claim is due to be dismissed, because the insurance contract did not require defendants to compensate plaintiffs for the damage to the engine. Specifically, defendants contend that the contract requires only that they compensate plaintiffs for "direct and accidental" losses to their vehicle, and that the engine damage occurred as a result of Mr. Day "continu[ing] to drive the vehicle for approximately twenty three miles on an empty radiator despite being on notice that something was wrong with the car."[32]

It simply cannot be contended seriously that damage to

---

[32] Defendants' motion for summary judgment at 8.

9

plaintiffs' engine was "directly" caused by plaintiffs' collision with the dog. The evidence is uncontroverted that plaintiffs' engine was not physically harmed by the collision. If plaintiffs would have pulled into a service station immediately after the collision, the engine would have been unharmed and the present lawsuit would not have arisen. Instead, plaintiffs' engine sustained damage only after plaintiffs continued to drive the vehicle for approximately twenty three miles on an empty radiator despite being on notice that something was wrong with the car.[33]

In support of their argument, defendants rely on "Part D" of the insurance policy, which provides:

> CAR DAMAGE COVERAGE
> We will pay for loss to your insured car:
>
> (1) Caused by collision, or
>
> (2) Not caused by collision
>
> less any applicable deductibles. The deductible shall not apply to loss caused by collision of your insured car with another vehicle insured by us.
> ...
> ADDITIONAL DEFINITIONS USED IN THIS PART ONLY
> As used in this part
>
> (1) "Collision" means collision of our insured car with another object or upset of your insured car. <u>Loss caused by</u> missiles, falling objects fire, theft or larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion, <u>colliding with a bird or animal</u>, or breakage of glass <u>is not loss caused by "collision."</u> If breakage of glass results from a collision, you may elect to have it treated as loss caused by collision.
>
> (2) "<u>Loss</u>" <u>means direct and accidental loss of or damage to</u>

---

[33] *Id.* (original emphasis omitted).

10

> your insured car, including its equipment.
> ...
> EXCLUSIONS
> We do not cover loss:
> ...
> (2) to damage due and confined to wear and [tear], freezing, mechanical or electrical breakdown or failure, or road damage to tires. This exclusion does not apply to the damage results from the total theft of your insured car.[34]

Essentially, defendants request this court to determine as a matter of law that the damage to plaintiffs' engine was not a "direct and accidental" loss caused by plaintiffs' accident, but rather was the result of Mr. Day's decision to continue driving the vehicle. Such a decision, however, necessarily involves an analysis of proximate cause. See Bly v. Auto Owners Insurance Co., 437 So. 2d 495 (Ala. 1983).

> We find that the word "direct" means "immediate" or "proximate".... Direct loss ... means that a vehicle ... must be the proximate cause of the loss, the meaning of "proximate" being the same as in the law of negligence."

Id. at 496. The Alabama Supreme Court has defined proximate cause as "an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces the injury and without with the injury would not have occurred." Byrd v. Commercial Credit Corporation, 675 So. 2d 392, 393 (Ala. 1996). Moreover, in Alabama, a determination of proximate cause is a

---

[34] Plaintiffs' exhibit A (emphasis supplied).

11

function which is historically left to the province of the jury.

> The question of proximate case is almost always a question of fact to be determined by the jury. The question must go to the jury if reasonable inferences from the evidence support the theory of the complaint.

*Marshall County v. Uptain*, 409 So.2d 423, 425 (Ala. 1981).

In *Boecker v. Aetna Casualty and Surety Company*, 281 S.W.2d 561 (Mo. Ct. App. 1955), an insured's car collided with a tree without actual damage. The "[i]nsured got out of the car, examined it, and observed no damage. It was nighttime. There were no lights on the tree side of the car." *Boecker*, 281 S.W.2d at 563. Therefore, the insured attempted to drive the car away from the tree, and in the process, scraped the side of his car. The insurer's policy only obligated it "to pay for any direct and accidental loss of or damage to the automobile" and it argued that the collision was not the direct cause of the loss. The court, however, disagreed:

> A natural and continuous sequence of circumstances and events reveals the collision with the tree as the proximate cause of the loss. The loss would not have occurred in the absence of the collision. The "but for" test of causal relation is thus satisfied. ... The act of the motorist in making an effort to extricate his automobile from a position of potential damage is ordinarily to be expected in the natural and probable order of things. His act in applying the power to the automobile was not an intervening efficient cause serving to break the chain of causation or to interrupt the natural sequence of events. On the contrary, it was but the normal reaction to the stimulus of the situation created by the primary cause — the collision. We

12

rule that the collision was the proximate cause of the loss....

*Id.* at 564; *see also Womack v. Calvert Fire Ins. Co.*, 68 So. 2d 661 (La. Ct. App. 1953).

This court cannot conclude that Mr. Wiley's act of continuing to drive his vehicle after the collision was an unnatural act, sufficient to break the chain of causation. Mr. Wiley testified that his accident occurred very late at night, on a poorly lit section of Alabama Highway 69, and nothing immediately appeared wrong with his vehicle. His engine light never turned on, nor did he see or smell smoke at any prior to his final stop. Under these circumstances, the court declines to grant summary judgment in favor of defendants.[35]

Alternatively, defendants argue that they are "entitled to summary judgment under Alabama's doctrine of <u>unilateral contract</u> because plaintiffs accepted and cashed the $1,346.38 check Omni paid as full settlement of plaintiffs' collision claim."[36] They

---

[35] Moreover, the court notes that the parties have failed to address the clause in defendants' insurance policy where defendants agreed to pay for loss to an insured car "[n]ot caused by collision." To the extent that this clause has any applicability in the present action, the parties are directed to inform the court of such at the pretrial conference.

[36] Defendants argue that the contract was created by a letter, which preceded the check, and notified plaintiffs that "Omni's offer of $1346.38 was in complete satisfaction of plaintiffs' collision damage." (Defendants' motion at 9.) Despite defendants' characterization of the facts, the court finds that defendants have misconstrued the language of the letter.

13

rely on *Ex parte Amoco Fabrics and Fibers Company*, 729 So. 2d 336 (Ala. 1999), for the proposition that such a cause of action exists under Alabama law.

The court concludes, however, that the rationale of *Ex parte Amoco* is inapplicable to the present case. *Ex parte Amoco* involved a narrow principle recognized in the employment context, namely that an employee handbook can create an implied contract of employment, thereby imposing certain limits on an employer's right to discharge an employee. *Ex parte Amoco*, 729 So. 2d at 339. The Alabama Supreme Court explained:

> In *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987), Alabama adopted the position, taken by a number of other jurisdictions, that the provisions of an employee handbook can become a binding unilateral contract, thereby altering an employment relationship's at-will status. *Hoffman-La Roche* represented a departure from the at-will employment doctrine, but it also recognized that not all employer communications would justify such treatment. Rather, only those employer communications meeting the traditional requirements for the formation of a unilateral contract — an offer, communication, acceptance, and

---

The letter, dated August 26, 1997, provided:

Enclosed is the appraisal of the damage to your 1993 Toyota Camry.

A draft in the amount of $1346.38 is being sent in a separate mailing. The payment is based on the amount of the appraised damage less your $250 deductible, for the damage resulting from the impact of the dog with your vehicle. The remaining amount of damage will not be considered, as it was a result of the vehicle being driven after the impact and would not be considered direct and accidental.

Defendants' exhibit 3.

14

consideration — will bind the parties.

*Id.* (citations omitted).

Defendants apparently desire the expansion of the unilateral contract doctrine from the employment context to the present facts. This the court refuses to do. First, defendants have not cited any Alabama cases similarly applying the unilateral contract doctrine in the check-cashing context. Second, the court finds that defendants' stronger argument lies in the doctrine of accord and satisfaction,[37] but defendants have neither included such a defense in their motion for summary judgment nor in their answer. *See* Fed. R. Civ. P. 8(c) (including accord and satisfaction as an affirmative defense that must be specifically pled); *see also Waide v. Tractor and Equipment Company*, 545 So. 2d 1327, 1328 (Ala. 1989) (holding that accord and satisfaction must be specifically pled); *W.B. Davis Hosiery Mill, Inc. v. Word Lumber Company, Inc.*, 273 So. 2d 492, 496 (Ala. Civ. App. 1972) (noting that the defense of accord and satisfaction is not the same defense as plea of payment). Therefore, defendants' breach of contract claim will be submitted to the jury.

---

[37] By such a statement, the court is not implying that defendants would be successful on a defense of accord and satisfaction, had they included it in their motion.

## B. Bad Faith

The Alabama Supreme Court first recognized an actionable tort for an insurer's bad faith refusal to pay an insurance claim in *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1 (Ala. 1981). "Bad faith is the intentional failure by an insurer to perform the duty of good faith and fair dealing implied by law." *Koch v. State Farm Fire & Casualty Company*, 565 So.2d 226, 229 (Ala.1990). In *Chavers* the court held:

> [A]n actionable tort arises [from] an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."

405 So.2d at 7 (citation omitted).

The elements of a bad faith claim were summarized in *National Security Fire & Casualty Company v. Bowen*, 417 So.2d 179 (Ala. 1982), as follows:

> An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.
>
> Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:

16

>   (a) an insurance contract between the parties and a breach thereof by the defendant;
>
>   (b) an intentional refusal to pay the insured's claim;
>
>   (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
>
>   (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
>
>   (e) if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
>
> In short, plaintiff must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.
>
> The "debatable reason" under (c) above means an arguable reason, one that is open to debate or question.

417 So.2d at 183 (emphasis in original) (citations omitted).

Moreover, the Alabama Supreme Court has established the "directed verdict on the contract claim" standard for deciding whether the bad faith claim should be submitted to the jury. *See Blackburn v. Fidelity & Deposit Company*, 667 So.2d 661, 668 (Ala. 1995).

17

> In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim, and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

*National Savings Life Insurance Company v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

Applying these standards, defendants argue that they had an arguable reason for refusing to pay for the damage to plaintiffs' engine and, therefore, plaintiffs' bad faith claim is due to be dismissed. Specifically, defendants contend that they refused to pay for the damage, because that damage was not a direct and accidental result of plaintiffs' collision, but rather a result of plaintiffs' continuing to drive the vehicle after the accident.

The court concludes that this articulated reason is adequate justification for purposes of defendants' bad faith claim. This conclusion is not based on an ambiguity in defendants' contract, but rather, a disputed factual issue involving a proximate cause determination. *See Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 976-77 (Ala. 1998) (holding that an "insurer cannot use ambiguity in the contract as a basis for claiming a debatable

18

reason not to pay the claim. Otherwise, an insurer would have the incentive to write ambiguous policies in order to create an absolute defense to a bad faith claim"). Moreover, plaintiffs' have failed to produce any evidence that defendants intentionally failed to perform their duty of good faith. *See Dutton*, 419 So. 2d at 1362 (holding that plaintiff bears a heavy burden in a bad faith case). Accordingly, this claim is due to be dismissed.

### C. Fraud

Finally, defendants assert that plaintiffs' allegations of fraud are insufficient to warrant submission of the claim to the jury. Defendants argue that plaintiffs' fraud claim should fail, because plaintiffs have failed to plead or otherwise prove that defendants or their agents misrepresented any material facts. The court agrees.

For plaintiffs to recover in a fraud action, they must prove: "(1) that the defendant made a false misrepresentation; (2) that the false representation concerned a material fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." *Prestwood v. City of Andalusia*, 709 So. 2d 1173, 1175 (Ala. 1998); *see also* Ala. Code § 6-5-101 (Ala. 1991). "A false statement is an

19

FILED

GDJ/FMS:FEB 2000

00 JAN 27 AM 11: 49

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| MELVIN TYSON WILLIAMS | ) |
| MARLON TREMAYNE TALL | ) |
| MAURICE LAMAR WALKER | |

# INDICTMENT

COUNT ONE: (18 U.S.C. § 371)

The Grand Jury charges:

From on or about the 1st day of May, 1998 to on or about the 1st day of June 1998, within the Northern District of Alabama, the defendants,

MELVIN TYSON WILLIAMS
MARLON TREYMAYNE TALL
MAURICE LAMAR WALKER

did knowingly and willfully conspire and agree with each other and with others known and unknown to the grand jury, to commit offenses against the United States, that is, to knowingly possess letters, postal cards, packages, bags, mail and things contained therein, to include checks, which had been stolen, taken, embezzled and abstracted, as described below, knowing the same to have been stolen, taken, embezzled and abstracted, all in violation of Title 18 United States Code Sections 1708 and 371.

*[handwritten note, illegible] # 24 [...] indictment.

1